Chief Justice Robertson
delivered the Opinion of a majority of the Court
Judge Nicholas dissenting.
The President, Directors and Co. of the Bank of Kentucky having obtained a judgment against the administrators and heirs of John Read, deceased, on anote which he, as principal, and others, as his sureties, had given to the said bank, in September, 1823, and a fieri facias on the judgment, having been returned nulla bona — ' this suit was brought against the said administrators and their sureties, for a devastavit.
On the trial, the circuit court instructed the jury, in effect, that, in the administration of the assets of the deceased obligor, his note to the bank was, by law, entitled to the priority of a judgment, and that, therefore, if the administrators, knowing that it existed and was unpaid, had discharged notes which were due from the intestate to natural persons, they had, to that extent, been guilty of a devastavit.
That instruction presents the only important question upon this writ of error, prosecuted to reverse the judgment which was rendered against the administrators and their sureties.
The instruction cannot be maintained, unless there be some statutory enactment which imparted to notes made payable to the bank, a factitious dignity, and a precedence in the order of administration, beyond what they can be entitled to claim according to the doctrines of the common law.
The following extracts will exhibit all the statutory law that can operate directly on the present question.
*115 First. “ It shall be lawful for any person or persons having right to demand any money upon a protested foreign bill of exchange, to comrnen.ee and prosecute an action of debt, for principal, interest, and charges of protest, against the drawers and endorsers jointly, or against either of them separately; and judgment shall and may be given for such principal, charges and interest, after the rate of ten per centum per annum, as aforesaid, to the time of said judgment, and legal interest upon the money recovered until the same shall be fully satisfied.” 2nd Section of an Act of 1798, 1 Dig. 192.
Second. “ All foreign bills of exchange which are or shall be protested, shall, after the death of the drawer or endorser, be accounted of equal dignity with a judgment, and the executors or administrators of every such drawer or endorser shall be compelled to suffer judgment to pass against them, for all debts due upon protested foreign bills of exchange, before any bond, bill or other debt of equal or inferior dignity, under the penalty of being liable to pay the same out of their own- proper goods.” 3rd Section of the same Jlei'of 1798.
Third. A portion of the thirteenth section of the act incorporating the Bank of Kentucky. 1 Dig. 144.- — - “ And all notes or bills at any time discounted by the said corporation, shall be, and they are hereby, placed upon the same footing as foreign bills of exchange, so that the like remedy may be had for the recovery thereof, against the drawer Or drawers, endorser or endorsers, and with the like effect, (except so far as relates to-damages,) any law, custom or usage to the contrary notwithstanding.” ■
As bills of exchange are mercantile paper, regulatedby a peculiar code of the common law, denominated thelex mercatoria, there may have been an adequate and consistent reason for giving to “protested” foreign bills-of exchange (as the third section of the act of 1798, supra, did give,) the effect of judgments, as to the administration of the assets of a deceased drawer or endorser. And, as it was proper to impart negotiability to. notes discounted by the Bank of Kentucky, there was some just and consistent reason for placing them on the *116 footing of foreign bills of exchange as to the remedy and the effect of that remedy — so that the same remedy might,,be pursued on a discounted note, as that which was allowed, by law, in a parallel case, on a foreign bill; an(j consequently, in that respect, and to that extent, the thirteenth section of the bank charter applied to protested notes the second section of the act of 1198, respecting the remedy and the effect of the remedy on protested foreign bills of exchange. But, in other respects, it would be difficult to imagine any sufficient motive for placing notes of the bank on higher or better ground than that on which domestic bills of exchange had been placed. And, perceiving no motive of policy or justice for imputing to notes due to the bank, the dignity of judgments, in any case, or for any purpose, we are not inclined to extend, beyond its plain import, the provision quoted from the thirteenth section of the charter ; more especially as that import is fortified by some extraneous considerations. The literal and grammatical interpretation of that provision, taking it altogether, and giving a consistent operation to every part of it, is, that, as to the “ remedy” against “ drawers and endorsers” and as to the “ effect” of that remedy against them, (damages excepted,) and as to that remedy and its effect only, notes discounted by the bank were placed on the footing of protested foreign bills of exchange.
The language of the provision is not, that notes, when discounted by the bank, should be placed on the footing of protested foreign bills of exchange ; nor is it, simply and alone, even that such notes shall be placed on the footing of foreign bills of exchange; but it is, that they shall be placed on the footing of 1 (foreign bills of exchange,” with a specified restriction, and for a special purpose. Had the legislature intended to place those notes on the footing of protested foreign bills, in all respects, the word foreign would have been inserted, and nothing should have been added to what would then have been the legislative declaration — “ shall be placed on the footing of protested, foreign bills of exchange.” Had such been the intention of the legislature, such a provision would, without obscurity or doubt, have ex *117 pressed it, and then every word would have had án essential and consistent operation. But such is not the langtiage of the legislature : it is essentially of a different character and import. Not only is the important word “protestó” left out, (and doubtless with design,)' but a special qualification is added — “so thaf’ &c. This addition cannot be deemed mere supererogation. Judicially, it should be deemed, necessary for expressing the true legislative intention ; and it is our duty to give it some effect. Why, then, was it inserted ? and what should be its effect ? Supposing that it was added for some practical purpose, and was understood by the legislature, (ps we should suppose,) but one answer can be given to these questions, and that is, that it was intended to qualify the antecedent part of the enactment, and to shew, that it was not the intention of the legislature to place the notes of the bank on the footing, in ail respects, of foreign bills of exciiange ; and also, to shew to what extent they were to stand on the same ground. Had nothing more been said, than that such notes should “ be placed on the footing of foreign bills of exchange,” the third section of the act of 1798 (supra,) would not have applied, because that section gives the dignity of a judgment (in the administration of assets,) not to foreign bills of exchange merely as such, but only to “protestó” foreign bills. Nor would the second section of that act, as to the remedy on protested foreign bills of exchange, have been applicable to the notes of the bank, had the legislature provided only that they should stand on the footing of merely “foreign bills of exchange?” But the chief object of the enactment was to prescribe for notes discounted by the bank, the same remedy which was applicable to foreign bills of exchange; and therefore, lest it might be inferred that the notes of the bank were placed, in all respects, on the footing of“■protested” foreign bills of exchange, the legislature declared, that they should be “ placed on the footing of foreign bills of exchange ;” and lest the remedy contemplated would not have been deemed applicable had nothing explanatory, or more explicit, been said, the legislature added, “ so that the like remedy may be had for the recovery *118 thereof, against the drawer or drawers, endorser or endorsers, and with the like effect &c.” This latter provis'wn should be construed as comprehending protested foreign bills, because it would be difficult to imagine a state of case analogous t.o the liabilities of parties to the notes of the bank, in which a suit could be maintained on a foreign bill, unless it had been protested. But this provision as to remedy against drawers and endorsers, should not be.construed as placing notes of the bank on the footing of protested bills of exchange, for any other purpose than the remedy, and that, too, against drawers and endorsers only ; and nothing preceding that provision had placed notes of the bank on the footing of protested foreign bills. The words “ and icilh the like effect” evidently refer to the antecedent provision — “ so that the like remedy for the recovery thereof, may be had against the drawer or drawers, endorser or endorsers”, and mean precisely what they would import had they and “ the like remedy" been placed in juxtaposition, so as to read, “ so that the like remedy and with the like effect may be had against endorser and endorsers &c.” And thus it may be made manifest, that the words “ and with the like effect” refer to the remedy, and not to the note.
This literal and grammatical deduction, so obvious and inevitable, is fortified by another consideration.— The parenthetical words “(except as to damages,)” tend to shew that, by the expressions “and with the like effect,” the legislature meant the effect of a suit on a protested foreign bill of exchange. “ The like remedy" is action of debt against all the endorsers and drawers, jointly, or against any one of them separately. And the effect of that remedy, as prescribed by the second section of the act of 1798, is, that the note shall not be impeachable by an endorser or drawer, otherwise than a protested foreign bill might be impeached, and that principal, interest and charges of protest, may be recovered from all or any one of the drawers and endorsers.
Thus every word of the provision .quoted from the thirteenth section of the charter of the bank, may have a full and consistent operation by restricting their ap *119 plication to the second section of the act of 1798 ; and neither the letter of the provision, nor the utility and harmony of its parts, will authorize a construction that will embrace the third section of that act, giving to protested bills of exchange the dignity of judgments. There is no analogy between the thirteenth section of the charter, and the act of 1812, elevating certain unsealed writings to the dignity of sealed instruments.— The latter places the unsealed on the footing of sealed contracts in all respects — to be entitled to the same consideration and effect, and to be the foundations of the same form of action. This creates a perfect parallelism in every essential particular ; and the enactment contains nothing incongruous or restrictive. There is -not a word in the thirteenth section of the' charter, that imports an intention to extrend, beyond the remedy by suit against drawers and endorsers, the similitude between notes discounted by the bank, and protested foreign bills of exchange. This should be deemed sufficient. But there are some negative considerations which fortify the conclusion thus deduced from the words of the thirteenth section. The remedy of which it speaks, is a remedy against endorsers and drawers only, and undoubtedly refers to that prescribed by the second section of the act of 1798. That remedy, and with the same effect, does not apply to a personal representative of a drawer or endorser : first, because the thirteenth' section of the charter restricts it to drawers and endorsers; second, because a joint suit against such personal representative, and a surviving drawer or endorser, .could not be maintained; third, because the remedy by suit, and the effect of such remedy, as provided for by the second section of the act .of 1798, and by the thirteenth section of the charter, evén if they applied to a personal representative of a drawer or endorser, can have no connection with the third section of the act of 1798, which gives to protested foreign bills of exchange the dignity of judgments, as against executors and administrators, without regard to any suit, and, of course, before suit, The second section of the act of 1798 has no effect on the relative dignity of protested foreign bills, *120 jn ¿he administration of assets ; it applies only to the remedy and the effect of the remedy by suit, on such bill, against the drawer and endorser. The thirteenth section of the charter of the bank, like the second section of the act of 1798, applies only to the remedy, and the effect of the remedy, on the note against drawer and endorser, and does not affect, or attempt to affect, the dignity of the note without suit and as against administrators and executors in the administration of assets. There is nothing in the thirteenth section of the charter, any more than there is in the second section of the act of 1798, which alludes to the dignity of a protested note or bill in the order of administration; and it would be difficult to give it such a construction as to produce such an effect ;‘ indeed, it could not be done consistently with the right rules of philology, or with the presumption that the legislature understood the import of its own language, and deemed the words which have been adopted, necessary and proper, to express the true intention of the enactment.
But were it admitted that the true import of the thirteenth section is doubtful, even then we should not be inclined to adopt, by any doubtful process, a construction that would give to notes discounted by the Bank of Kentucky, the dignity and effect of judgments, in the administration of assets. Before we would attribute to them such character and privilege, we should be thoroughly convinced that the legislative will, plainly expressed, has so directed.
The third section of the act of 1798 is explicit and unambiguous; and the charter of the Bank of the Commonwealth is equally so ; it declares that, “ all such notes (meaning notes discounted by the Bank of the Commonwealth,) shail be debts of superior dignity, and shall be paid first by executors and administrators.” — - But nothing resembling this provision, or the second section of the act of 1798, can be found in the charter of the Bank of Kentucky. The only reasonable deduction from this circumstance is, that the legislature did not, in the one case, intend to do what, in the others, it thought proper to do, in a distinct, direct and expli *121 cit enactment. Moreover, as the sovereign has a prerogative right to priority, there was an obvious and consistent motive for declaring, that notes discounted by the Bank of the Commonwealth should be paid first by administrators and executors. But no such motive applied to the Bank of Kentucky. The interest of the state in the stock of the latter was comparatively inconsiderable, and that interest it held as other individual stockholders.
Dissent of Judge Nicholas
But whatever room there might have been for a diversity of construction, had no judicial interpretation been ever given by this court, to the thirteenth section of the charter of the Bank of Kentucky, all perplexing doubt should, in our judgment, be deemed to have been settled by the opinion of our predecessors, in the unreported case of The Bank of Kentucky vs. Sturgus’ Administrators, decided in 1828. In that case, the court decided express!}', that notes discounted by the Bank of ’ Kentucky, are not, by law, entitled to the priority of judgments, or any other priority, over other notes of equal natural dignity. One direct decision on such a question, should be satisfactory and conclusive. A personal representative would have just cause to complain, if this court should convict him of a devastavit for administering assets and paying debts according to the law as it had been expounded and settled by the same court. We would not, therefore, feel authorized to overrule the decision in the Bank as. Sturgus’ Administrators, even if the point decided were more doubtful than it is, or than it could be deemed to be, as an original and unsettled matter of construction.
Wherefore, it is the opinion of a majority of this court (Judge Nicholas dissenting,) that the judgment of the circuit court is erroneous, and should be reversed.
Judgment reversed, and cause remanded for a new trial.